*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

In re BOYCE, Minors.

UNPUBLISHED
January 23, 2020

No. 348992
Montcalm Circuit Court
Family Division
LC No. 2018-000834-NA

Before: MARKEY, P.J., and GLEICHER and M. J. KELLY, JJ.

PER CURIAM.

The circuit court terminated respondent-mother's parental rights to her two daughters—BMB and BKB—under MCL 712A.19b(3)(b)(*i*) (child suffered physical injury or physical sexual abuse and is likely to suffer from injury or abuse in the foreseeable future) and (j) (reasonable likelihood that child will be harmed if returned to the parent). Respondent challenges the court's determination that aggravating circumstances existed, excusing the Department of Health and Human Services (DHHS) from providing reunification services, as well as the court's factual findings underlying the termination decision. We affirm.

## I. BACKGROUND

Respondent, a mother of three, is no stranger to the child protective system. Twenty-two Child Protective Services (CPS) complaints have been raised against her since BMB's 2005 birth for issues ranging from physical abuse to medical neglect; two were substantiated. Respondent's eldest daughter, BB, has been in a guardianship with respondent's mother for several years. BMB had also previously been in a guardianship but had been returned to respondent's care. In March 2018, after respondent regained custody of BMB, CPS substantiated a complaint that respondent had not enrolled BMB and BKB in school for the 2017-2018 school year.

The allegations underlying the current action relate to respondent's inappropriate parenting of BMB. BMB was born in 2005 and was 12 years old when CPS took her into care. During a July 2, 2018 child forensic interview, BMB told an investigator that she and respondent used heroin, methamphetamine, bath salts, and marijuana together. BMB also accused her

mother of accepting money to allow a 34-year-old man to have sex with her. The man in question, Oscar Edwards, admitted that he engaged in sex with the child; he denied that he paid respondent, but asserted that respondent was present and aware of the situation.[1] CPS placed BMB in a group home that provided services for the victims of human trafficking. Six-year-old BKB was placed with her biological father.

As the DHHS and police investigation unfolded, the allegations of human trafficking became more tenuous. Instead, the record suggests that BMB was a troubled child who sought out older boys on the Internet. She then fell into an improper (and illegal) relationship with Edwards. As BMB was only 12 years old, she could not consent to any sexual relationship, even one with an older teenager, and certainly not one with a 34-year-old man.[2] Although respondent had not instigated the sexual encounters, she admitted that she knew BMB had engaged in sexual acts with several older males. Respondent responsibly authorized the insertion of a subcutaneous birth control device in BMB's arm. However, respondent failed to protect her 12-year-old daughter from the sexual predators she encountered. Respondent admitted that she had met 34-year-old Edwards, but believed he was only 16 or 17 years old. She asserted in a police interview that a 16 or 17-year-old male was an "age appropriate" romantic partner for her 12-year-old daughter. And respondent conceded that she left Edwards alone in her hotel room with BMB, enabling Edwards to sexually penetrate her vulnerable daughter.

The circuit court found aggravating circumstances to pursue termination without providing reunification services. It suspended respondent's parenting time with both girls. Respondent then pleaded no contest to grounds for court jurisdiction. Thereafter, respondent did not appear at the final dispositional hearing or the termination hearing. At the close of the hearing, the court terminated respondent's parental rights under MCL 712A.19b(3)(b)(i) and (j) as follows:

> In this instance, the mother was clearly aware that her 12 year old daughter was engaging in acts of sexual intercourse with random men, and as a result had a birth control device planted in the 12 year old, perhaps 13 year old's, arm so she wouldn't get pregnant.[3] The mother was aware of the sexual activity.

---

[1] With an altered offense date of September 2018, Edwards pleaded to three counts of third degree criminal sexual conduct against a person between the ages of 13 and 15. A criminal court sentenced Edwards to 10 to 15 years in prison. See OTIS, available at <http://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=573352> (accessed December 13, 2019).

[2] MCL 750.520b(1) provides no defense for a person who engages in sexual penetration with a child under the age of 13. MCL 28.728c(14) permits a convicted sex offender to avoid registration requirements, but only when the victim is between the ages of 13 and 16 and the offender is not more than four years older than the victim.

[3] BMB did not turn 13 until July 20, 2018, after she had been removed from her mother's care. Accordingly, all sexual acts described on the record occurred when the child was 12 years old or younger.

She was allowing the perpetrators in her home to visit the child, in motel rooms alone. . . .

But regardless, [respondent] clearly knew that her daughter was engaging in sexual acts with other men, not just Oscar, other men. The mother identified these men. There was a man in Muskegon. There was Oscar, from Battle Creek, and there was another gentleman she also referenced and I couldn't catch the name if she even had a name for him. She was aware of these things, and she kept allowing it to happen. She claims some type of lack of knowledge because it was occurring when she wasn't around. That she'd find it on Facebook. I find that also incredulous to believe that she wasn't aware of these activities. She was aware of them, but it was okay because she thought they were 16, 15, 14, 17, however old she thought they were. Come to find out they're adult males, and she did nothing to protect her daughter, nothing.

So I'm going to terminate her parental rights under . . . that theory, and also under MCL 712A.19b(3)(j). There's no question, in this Court's mind, that . . . there is a reasonable likelihood based on [respondent's] conduct, prior to the child's removal, that the child would clearly be harmed if returned to the mother's care . . . . [T]his case just boggles my mind that a woman who proclaims she was raised better than that would allow her 12 year old daughter to have intercourse [with] adult men, but perhaps it would be okay if these adult men look like they were 15 or 16, and it was age appropriate it was okay. That just shows a complete lack of insight, any insight, into the harmful effects that this was having on her daughter, and an utter lack of protecting her, and I'm just disgusted, frankly, with the mother's lack of parenting in this case.

The court further determined that termination of respondent's parental rights to young BKB was also required. The court found that termination of respondent's parental rights was in the best interests of both children based on respondent's failure to protect her children and lack of understanding regarding how to parent. The court opined that respondent "doesn't care what happens to these girls."

Respondent now appeals.

II. REUNIFICATION EFFORTS

Respondent challenges the circuit court's conclusion that reunification services were not required in this case because aggravated circumstances existed. We review for clear error a circuit court's factual findings in a child protective proceeding. See *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). "Generally, reasonable efforts must be made to reunite the parent and children unless certain aggravating circumstances exist." *In re Moss*, 301 Mich App 76, 90-91; 836 NW2d 182 (2013). Relevant to this appeal, pursuant to MCL 712A.19a(2)(a), "reasonable efforts to reunite the child and family are not required" if "[t]here is a judicial determination that the parent has subjected the child to aggravated circumstances as provided in [MCL 722.638(1) and (2)]." MCL 722.638 describes the following "aggravated circumstances":

(1) The department shall submit a petition for authorization by the court under [MCL 712A.2(b)], if 1 or more of the following apply:

(a) The department determines that a parent, guardian, or custodian, or a person who is 18 years of age or older and who resides for any length of time in the child's home, has abused the child or a sibling of the child and the abuse included 1 or more of the following:

* * *

(*ii*) Criminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate.

* * *

(2) In a petition submitted as required by subsection (1), if a parent is a suspected perpetrator or is suspected of placing the child at an unreasonable risk of harm due to the parent's failure to take reasonable steps to intervene to eliminate that risk, the department shall include a request for termination of parental rights at the initial dispositional hearing as authorized under . . . MCL 712A.19b.

From the start of these proceedings, it was clear that respondent had allowed her 12-year-old daughter to engage in sexual acts with multiple older males, including Edwards. Respondent knew BMB was sexually active and ensured that she was on birth control. Respondent admitted to police that she thought it was age appropriate for her 12-year-old child to have intercourse with teenage boys as old as 17. Respondent further described that she left her 12-year-old child alone in a hotel room with Edwards because she wanted to go downstairs and meet a friend. Respondent absurdly asserted that the 34-year-old Edwards (who was older than respondent) was a teenager. On this record, the court could easily determine that BMB was the victim of "[c]riminal sexual conduct involving penetration" and that respondent "plac[ed] the child at an unreasonable risk of harm due to the parent's failure to take reasonable steps to intervene to eliminate that risk." Accordingly, we discern no error in the circuit court's assessment that reunification efforts were not required in this case.

### III. STATUTORY GROUNDS

Respondent also challenges the evidence supporting the statutory grounds underlying the court's termination decision. Pursuant to MCL 712A.19b(3), a circuit court "may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence" that at least one statutory ground has been proven by the DHHS. MCR 3.977(A)(3); *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000). We review for clear error a circuit court's factual finding that a statutory termination ground has been established. *In re Rood*, 483 Mich 73, 90-91; 763 NW2d 587 (2009). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Moss*, 301 Mich App at 80 (quotation marks and citation omitted). "Clear error signifies a decision that strikes us as more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

As noted, the court terminated respondent's parental rights pursuant to MCL 712A.19b(3)(b)(*i*) and (j), which provide:

The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

* * *

(b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

(*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

Even if the court could not conclude under factor (b)(*i*) that respondent's acts had caused BMB to suffer sexual abuse, termination of respondent's parental rights was supported under factor (j). The court need only find one statutory ground to support termination of parental rights. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009). The harm contemplated under factor (j) includes emotional as well as physical harm. See *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011). We have recognized that "[e]ven when there is no palpable physical injury or overtly coercive act, sexual abuse of children causes substantial long-term psychological effects, with implications of far-reaching social consequences." *People v Benton*, 294 Mich App 191, 206; 817 NW2d 599 (2011). This statement is proven true in this case.

The social file in this case includes reports prepared by social workers and therapists working with BMB. These reports indicate that despite therapy, BMB does not understand that she was the victim of sexual abuse. BMB expressed that she was in love with Edwards and blamed herself for the trouble Edwards and respondent faced. Although BMB did not have access to social media in her group home, BMB was intercepted "trying to solicit herself to a 19-year-old male" on social media during a community visit with her aunt. A psychologist conducted a trauma assessment and diagnosed BMB with post traumatic stress disorder and chronic type depression. The psychologist noted that BMB

has excessive aggression toward self and others, explosive behavior, hyperactive, oppositional and defiant, extreme sexual behaviors, difficulty with sleeping, excessive mood swings, intense frequent anger, chronic sadness, withdrawn and emotionally numb, attention and memory problems, difficulty with authority, does not seek adult help with hurt or scared, and has a lack of appropriate boundaries in relationships.

BMB was also required to participate in substance abuse programming while in care due to respondent's parenting choices.

The record clearly supports that BMB is a very troubled child. Respondent's failure to protect BMB from sexual predators and her use of serious controlled substances with BMB were major causes of the child's troubles. Historical patterns of physical abuse in respondent's home exacerbated BMB's difficulties. Respondent did not comprehend the harm that she had caused BMB, placing the blame on BMB's incorrigibility. It is clear that BMB has been traumatized by her mother's actions and inactions and faced a very real chance of continued harm if returned to her mother's care. Given the harm caused to BMB by respondent's inappropriate parenting, and respondent's failure to enroll her children in school, it is likely that BKB would fall prey to the same harms as her older sister in the future.

Accordingly, we discern no error in the circuit court's determination that termination of respondent's parental rights was justified.

## IV. BEST INTERESTS

Respondent also contends that termination of her parental rights was not in her children's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *Moss*, 301 Mich App at 90. The court should weigh all the evidence available to it in determining the child's best interests. *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). And we review the court's factual findings in this regard for clear error. *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 637; 853 NW2d 459 (2014).

Factors relevant to the best-interest determination include "the child's bond to the parent, the parent's parenting ability, [and] the child's need for permanency, stability, and finality," as well as the advantages of the foster home over the child's home with the parent. *Olive/Metts*, 297 Mich App at 41-42 (quotation marks and citations omitted). "The trial court may also consider a parent's history of domestic violence, . . . the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). The circuit court must address the possibility of placement with a relative, which weighs against termination. *In re Gonzales/Martinez Minors*, 310 Mich App 426, 434; 871 NW2d 868 (2015). And the court must "consider the needs of each child individually." *White*, 303 Mich App at 714. Ultimately, "the focus at the best-interest stage [is] on the child, not the parent." *Moss*, 301 Mich App at 87.

We are concerned that the circuit court seemingly considered BKB's best interests as an afterthought and did not acknowledge at the best-interest stage that BKB had been placed with her father. However, given the extreme circumstances in this case, we cannot conclude that the circuit court erred in finding that termination of respondent's parental rights was in the best interests of both children.

Throughout these proceedings, the DHHS presented evidence that respondent and her boyfriends had used extreme physical discipline against the children in the past. Respondent had neglected both children's education by failing to enroll them in school for the 2017-2018 school year. BKB missed kindergarten and had a serious speech delay, which apparently had not been addressed in any manner. A therapist noted that BKB looked to BMB for mothering, rather than respondent, evidencing respondent's neglect of her youngest child. And undisputed evidence supported that BKB had flourished in the care of her father and his girlfriend. The couple had dived into caring for BKB's special needs and the child showed significant improvement. This evidence supplemented the record that BKB faced a real possibility of future harm as a result of respondent's highly questionable parenting skills.

And given the record evidence, it is clear that BMB's bond with her mother is an unhealthy one. BMB reported that she used controlled substances with her mother. Respondent lacked any comprehension of how her failure to protect BMB from physical abuse as a young child and from sexual predators as a preteen had damaged BMB. BMB suffered severe emotional trauma that will affect her for the rest of her life. It is clear on this record that termination was in the children's best interests.

We affirm.

/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly